**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.J-M.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.L.S., IV, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 108 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 019 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: M.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.L.S., IV, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 109 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): 018 of 2023

| | | |
|---|---|---|
| IN RE: ADOPTION OF: T.D.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.L.S., IV, FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 110 WDA 2024 |

Appeal from the Order Entered December 13, 2023
In the Court of Common Pleas of Westmoreland County
Orphans' Court at No(s): No. 020 of 2023

J-S22002-24

BEFORE: PANELLA, P.J.E., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY PANELLA, P.J.E.:        **FILED: September 27, 2024**

H.L.S., IV ("Father") appeals from the December 13, 2023 orders involuntarily terminating his parental rights to his biological sons, M.D.S., born in November 2013; T.S.S., born in January 2011; and M.J.-M.S., born in December 2012 (collectively, "the Children"), pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b).[1] After review, we affirm.

Our review of the certified record indicates that, due to allegations of "incorrigibility and truancy" and concerns regarding Mother's substance abuse, the Westmoreland County Children's Bureau ("the Agency") became involved with this family in January 2021. *See* N.T., 11/16/23, at 6; Agency Exhibit 12. We discern that Father was incarcerated at that time and had been incarcerated since approximately 2018.[2] *See* N.T., 11/16/23, at 5, 21, 67-68, 71; *see also* Agency Exhibit 12. Ultimately, in July of 2021, the court placed the Children in the legal and physical custody of the Agency. The Children

_____

[1] The court involuntarily terminated the parental rights of the Children's mother, J.C. ("Mother"), via the same orders. Mother likewise appealed, and we address her appeals by separate memorandum at Superior Court Docket Nos. 37-41 WDA 2024.

Additionally, by separate orders, the court involuntarily terminated the parental rights of Mother to two younger sons fathered by different men. These two children are not the subject of these appeals.

[2] Father has an extensive criminal history. *See* Agency Exhibit 1; *see also* N.T., 6/2/23, at 13-16.

were placed in kinship care with their maternal aunt, M.C. ("Maternal Aunt"), where they have remained throughout these proceedings. **See** N.T., 11/16/23, at 4-5, 30, 81-82; **see also** Agency Exhibit 12.

The court adjudicated the Children dependent on August 23, 2021, and established an initial permanency goal of return to parent or guardian.[3] The orphans' court aptly summarized Father's status with respect to the Children and his obligations in furtherance of reunification, as follows:

> At the time of the [adjudication], it was noted that Father had not spoken with [the Children] for a year and a half. Father was ordered to undergo a drug and alcohol evaluation and was to comply with any recommended treatment until successful discharge. He was to participate in parenting instruction, which was to include a parenting curriculum and/or hands on parenting until successful completion. Father was ordered to obtain and maintain stable and appropriate housing which was to be kept in a safe and clean manner. Father was also to contact the [Agency] to be assessed for services needed for reunification. He was also to partake in counseling while incarcerated.[4]

Orphans' Court Opinion, 12/13/23, at 4 (unpaginated) (cleaned up).[5] Additionally, the court provided for visitation between Father and the Children at the discretion of the Agency.

---

[3] The court established a concurrent permanency goal of adoption on November 1, 2021. **See** Agency Exhibit 12.

[4] These directives remained substantially similar throughout the ensuing dependency proceedings. **See id.**

[5] For purposes of this memorandum, we refer to the opinions submitted contemporaneously with the subject termination orders as Orphans' Court Opinion. While the court filed separate opinions at each lower court docket
*(Footnote Continued Next Page)*

At regular permanency review hearings conducted from May 2022 through December 2022, Father's compliance and progress were characterized as none to minimal due to his continuing incarceration and inability to participate in services. *See* N.T., 11/16/23, at 16, 21, 24-26; Agency Exhibit 12. As discussed further *infra*, Father remained incarcerated throughout the ensuing dependency proceedings until February 2023. ***See*** N.T., 11/16/23, at 16, 21, 35, 67, 71-72; ***see also*** Agency Exhibit 12. He was then re-incarcerated in August 2023. ***See*** N.T., 11/16/23, at 21.

Moreover, while Father engaged in contact with the Children via telephone and cards, as arranged between him and Maternal Aunt,[6] in May 2022, the court suspended all contact between Father and the Children, pending resolution of outstanding CPS reports and a parenting assessment.[7]

_____

number, as they are substantially similar, we cite generically and without differentiation.

[6] Amber Wannamaker, a caseworker for the Agency, testified that the Agency was unable to offer Father in-person or virtual supervised visitation due to his incarceration and the COVID restrictions of his correctional facility at the time. ***See*** N.T., 11/16/23, at 21-22, 60-61. She further indicated that, in November 2021, following a negative reaction from the Children to a telephone call, as well as due to outstanding Child Protective Services ("CPS") reports, discussed *infra*, the Agency then limited Father's contact to letters and cards, which also yielded a negative reaction by the Children. ***See id.*** at 19-20, 58-61-62, 88-89.

[7] Specifically, "[t]he children [] disclosed sexual abuse, mental injury, related to the fact that there was drug use while they lived with [M]other, that they lacked food while they lived with [M]other, and that there was physical abuse while they were with [M]other." Agency Exhibit 12, Recommendation-
*(Footnote Continued Next Page)*

*See* N.T., 11/16/23, at 18-19, 45, 61, 74; Agency Exhibit 12. In suspending Father's contact, the court stated, "[T]he professional staff believe that Father is part of the trauma that these [C]hildren have experienced. The [C]hildren had told the therapist that Father had beaten them and, apparently, they did not feel safe with Father." Agency Exhibit 12, Recommendation-Permanency Review, 5/10/22, at 2-3. This "no contact" order remained in effect at the time of the subject proceedings. *See* Agency Exhibit 12.

Thereafter, Father was released from prison in February 2023. *See* N.T., 11/16/23, at 21, 67. At a permanency review hearing on June 28, 2023, at which Father did not appear, his compliance and progress were characterized as minimal, as he had only completed a parenting assessment. *See* Agency Exhibit 12; *see also* N.T., 11/16/23, at 27. Father was then re-incarcerated in August 2023 and remained incarcerated at the conclusion of the subject proceedings.[8] *See* N.T., 11/16/23, at 21, 67.

---

Permanency Review, 5/10/22, at 2. These disclosures resulted in seven CPS reports which were outstanding at the time and were ultimately indicated. *See id.*; *see also* N.T., 11/16/23, at 49. Despite Father indicating that he was involved in the Children's lives prior to his incarceration, he denied knowledge of the Children's circumstances in Mother's home and failed to take any actions with respect to the Children. *See* N.T., 11/16/23, at 44, 72, 81.

[8] While the charges resulting in Father's newest incarceration are not disclosed in the certified record, as best we can discern, they remained pending at the conclusion of the subject proceedings.

In the meantime, on February 1, 2023, the Agency filed petitions to involuntarily terminate Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). The court held hearings on the Agency's petitions on June 29, 2023, November 2, 2023, and November 16, 2023. Over the course of the three hearings, the Agency presented the testimony of its caseworker, as well as numerous service providers. Specifically, the Agency presented the testimony of the following witnesses: Jean DeFilippis, of ARC Point Labs, who performed drug testing services; Dr. Neil Rosenblum, clinical psychologist, of Allegheny Forensic Associates, who conducted mental health evaluations of the Children and was stipulated as an expert in mental health evaluations; Richelle O'Malley, of In-Clusion, who conducted a parenting assessment of Mother and Father; Nicole LaValle, school-based therapist, of Excela Health, now Independence Health System, who provided outpatient individual therapy to the Children; Dr. Christine Mahady, certified attachment and trauma-focused clinician, who conducted assessments of the Children and provided individual and family therapy and was stipulated as an expert witness in trauma therapy and assessments; Vijaya Greene, of In-Clusion, who was contracted to provide parenting services to Father; Ashley McKoy, certified trauma and attachment clinician, who provided individual therapy and was stipulated as an expert in the field of trauma therapy and therapeutic play; Thomas Sibel, family resource specialist, of JusticeWorks; and Amber

Wannamaker, Agency caseworker.[9] Father was present and represented by counsel. He did not testify or offer any evidence.[10]

By orders dated December 13, 2023, the orphans' court involuntarily terminated Father's parental rights to the Children pursuant to 23 Pa.C.S.A. § 2511(a)(2), (8), and (b). The court filed contemporaneous opinions setting forth its rationale. On January 12, 2024, Father timely filed separate notices of appeal, along with concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[11] The court filed responsive Rule 1925(a) opinions on December 28, 2023, wherein it referred this Court to its prior filings.

On appeal, Father raises the following issues for our review:

I. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to terminating the parental rights of Father under 23 Pa.C.S.A. § 2511(a)(2).

II. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden as to

---

[9] The Agency additionally presented the testimony of another provider related to the father of another child of Mother who is not the subject of these appeals.

[10] The Children were represented by a separate guardian *ad litem* ("GAL") and legal counsel. **See** 23 Pa.C.S.A. § 2313(a). Both argued for termination of Father's parental rights at the conclusion of the subject proceedings. **See** N.T., 11/16/23, at 91, 99-100. Additionally, the GAL filed a brief with this Court in support of the involuntary termination of Father's parental rights. **See** Participants' Brief, 4/18/24.

[11] This Court consolidated Father's appeals *sua sponte* on January 30, 2024.

terminating the parental rights of Father under 23 Pa.C.S.A. § 2511(a)(8).

III. Whether the [orphans' court] erred in finding by clear and convincing evidence that the moving party met its burden under 23 Pa.C.S.A. §2511(b) that the best interests of the Child are met by terminating Father's parental rights.

IV. Whether the [orphans' court] erred in terminating Father's parental rights despite the Westmoreland County Children's Bureau's (the "Agency") failure to ever provide visitation to Father.

V. Whether the [orphans' court] erred in terminating Father's parental rights, despite the Agency's own expert therapist testifying that visits with Father could be a therapeutic breakthrough for the Children.

Father's Brief at 4-5 (cleaned up).

Our standard of review in this context is well-established:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record. Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her

child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*Interest of M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (cleaned up).

The involuntary termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. *See* 23 Pa.C.S.A. § 2511. The trial court must initially determine whether the conduct of the parent warrants termination under one of the eleven enumerated grounds set forth at Section 2511(a). Only if the court determines that the petitioner has established grounds for termination under Section 2511(a) does it then engage in assessing the petition under Section 2511(b), which focuses upon the child's needs and welfare. *See In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). To involuntarily terminate parental rights, the petitioner must satisfy both Section 2511(a) and (b) by clear and convincing evidence. *See In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see also Interest of M.E.*, 283 A.3d at 830.

In the case *sub judice*, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(2), (8),[12] and (b). To affirm the underlying

_____

[12] We note Section 2511(a)(8) is inapplicable to Father, due to his incarceration at the time of the Children's removal from Mother's care. *See*
*(Footnote Continued Next Page)*

- 9 -

decrees, however, we need only agree with the court's decision as to any one subsection of Section 2511(a), along with Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). As such, we will focus our discussion on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

---

Agency Exhibit 12; N.T., 11/16/23, at 67-68; *see also In re C.S.*, 761 A.2d 1197, 1200 n.5 (Pa. Super. 2000) (*en banc*) (stating that Section 2511(a)(5) and (8) did not provide a basis for terminating the father's parental rights when he was incarcerated at the time of the child's removal from the mother's care); *see also In re Z.P.*, 994 A.2d 1108, 1123 n.2 (Pa. Super. 2010) (same). However, this does not affect our disposition, as we conclude termination was proper pursuant to Section 2511(a)(2) and (b).

23 Pa.C.S.A. § 2511(a)(2), (b).

To prove the applicability of subsection (a)(2), the party petitioning for termination must establish: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot and will not be remedied. *See In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). Subsection (a)(2) emphasizes the child's present and future needs, not the parent's refusal to perform their duties and thus "should not be read to compel courts to ignore a child's need for a stable home and strong continuous parental ties. . . . **This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it**." *In re Z.P.*, 994 A.2d at 1117 (cleaned up) (emphasis in original). Section 2511(a)(2) grounds are not limited to affirmative misconduct; they may also include acts of refusal and incapacity to perform parental duties. *See In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021), *abrogated on other grounds by Interest of K.T.*, 296 A.3d 1085, 1110 n.23 (Pa. 2023).

We have long recognized that "[p]arents are required to make diligent efforts towards the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443. Relatedly, while a parent's incarceration is not automatically dispositive with respect to termination, it **is** a relevant and

- 11 -

potentially determinative factor to consider pursuant to Section 2511(a)(2). Specifically,

> incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under [Section] 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*In re Adoption of S.P.*, 47 A.3d 817, 828 (Pa. 2012); *see id.* at 830. Likewise, this Court has concluded that a no contact order is dispositive to incapacity, likening it to a long-term incarceration. *In re A.D.*, 93 A.3d 888, 896–897 (Pa. Super. 2014).

We begin by addressing Father's first claim for relief, which challenges the orphans' court's findings under Section 2511(a)(2). In concluding that termination of Father's parental rights was warranted under this subsection, the orphans' court emphasized Father's history of incarceration and lack of involvement, both with the Children and with services. The court reasoned as follows:

> Father has been incarcerated off and on for the duration of the dependency action. Prior to the dependency action, it is believed that Father had no involvement with the [Children] for a year and a half, despite his argument that he was involved. No evidence was provided to the court to prove or contradict these arguments. Father only had minimal compliance with the [A]gency and was unable to have visits on account of concerns for the well-being of the [Children]. Father has not shown his ability to parent [the Children] and further is incarcerated again. As such, Father is unable to parent [the Children] and when provided with services, did not utilize said services in a way that would show his ability to remedy the reason with which the [A]gency took custody of [the Children] in the first place.

Orphans' Court Opinion, 12/13/23, at 10 (unpaginated).

Conversely, Father contends that he demonstrated progress with respect to housing, employment, and parenting during the time he was not incarcerated. *See* Father's Brief 29-30. He asserts that "he was putting together the steps necessary to provide for the well[-]being of his Children, and that he can remedy any existing deficiencies." *Id.* at 30. He further maintains that he had not been convicted with respect to his current incarceration, which remains the sole basis for his current incapacity, and can therefore be remedied. *See id.* We must disagree.

A review of the record reveals significant support for the orphans' court's findings under Section 2511(a)(2). Significantly, the record confirms Father's extensive history of incarceration. As confirmed by Ms. Wannamaker, Father was "in and out of prison" throughout the dependency proceedings and, indeed, throughout the Children's lives. *See id.* at 16, 35, 72; *see also* N.T., 6/29/23, at 13-16; Agency Exhibit 1. Specifically, Father was incarcerated in approximately 2018, prior to the Children's removal and adjudication in 2021, and remained incarcerated until February 2023. *See* N.T., 11/16/23, at 21, 35, 67, 71; *see also* Agency Exhibit 12. He was then re-incarcerated in August 2023 and remained imprisoned throughout the remainder of the subject proceedings. *See id.* at 21; *see also* Agency Exhibit 12.

The record also reflects that, while confined, Father failed to complete any services. Ms. Wannamaker explained, "[Father], while he was

incarcerated at SCI Greene, did not participate in any services. At every hearing and any communication that I had with him throughout, he stated that they did not offer services to him there, so he was unable to participate in any services." *Id.* at 35; *see id.* at 63-64; *see also* Agency Exhibit 12. Further, from February 2023 to August 2023, while released, Father only completed a parenting assessment. *See id.* at 17-18, 68; *see also* Agency Exhibit 12, Permanency Review Order, 6/28/23, at 2. He was recommended to participate in a parenting curriculum prior to any consideration of supervised visitation. *See* N.T., 11/16/23, at 18.

Father also failed to complete a drug and alcohol evaluation. *See id.* at 15. Further, he only engaged in one random drug screen, which occurred on the first date of the subject proceedings, June 29, 2023, and was positive for cocaine and marijuana. *See id.* at 16; Agency Exhibit 4. Thereafter, drug screeners were unable to make contact with Father. *See* N.T., 11/16/23, at 16-17. Ms. Wannamaker explained, "We did have an address for him in Pittsburgh. However, when the testers went there, they were told that, by whoever's home it was, that Father did not live there. When I had reached out for a new address, he just kept providing me that the same address we had …." *Id.* at 16-17; *see also id.* at 68. Likewise, Ms. Wannamaker confirmed that Father had neither stable housing nor verifiable income. *See id.* at 22, 31, 70. Despite indicating to the Agency that he owned two homes, Agency

searches did not confirm the existence of any such property. ***See id.*** at 43-44.

Moreover, aside from his incarceration and lack of completion of services, the orphans' court suspended all contact between Father and the Children beginning in May 2022. ***See*** N.T., 11/16/23, at 18-19, 45, 61, 74; ***see also*** Agency Exhibit 12. This "no contact" order remained in effect at the time of the subject proceedings. ***See*** Agency Exhibit 12.

Overall, Ms. Wannamaker opined that Father was not able to appropriately care for the Children as he was unable to provide them stability and consistency. ***See id.*** at 31-32; ***see also id.*** at 72-73. Aside from acknowledging Father's incarcerations and lack of stable housing or income, she noted that the Children do not want to live with Father and that T.D.S. and M.J.-M.-S. do not even want any contact with Father. ***Id.*** at 31.

Based on the foregoing, we discern no abuse of discretion by the court in concluding that Father suffered from parental incapacities within the meaning of Section 2511(a)(2). The testimony and evidence recited above also demonstrates that Father's ongoing incarceration and suspended contact, as well as his refusal to engage in services, caused the Children to be without essential parental care, control, or subsistence necessary for their physical or mental well-being. ***See S.P.***, 47 A.3d at 828, 830; ***see also A.D.***, 93 A.3d at 896–97.

Moreover, the certified record indicates that the conditions and causes of Father's incapacity cannot or will not be remedied. Indeed, Ms. Wannamaker expressed her belief that Father was not likely to remedy his incapacities within a reasonable timeframe. She explained that Father would need to be reassessed and complete further services following the end of his current term of incarceration, which we reiterate was unknown due to the unresolved nature of the charges, and that the Children would need to be prepared for any such future contact.[13] ***See id.*** at 36.

It is thus speculative when and if Father will ever be in a position to care for the Children and provide them safety and stability. This prospect is simply unacceptable for the Children, who had already been in care for approximately two years at the time of the commencement of the subject proceedings. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's

---

[13] To the extent that Father's most recent criminal charges remained pending, we recognize that in ***In re C.B.***, 230 A.3d 341 (Pa. Super. 2020), *appeal denied*, 234 A.3d 410 (Pa. 2020), this Court affirmed the orphans' court's failure to terminate parental rights due to pending criminal charges. However, unlike the instant case, in ***C.B.*** we focused on Section 2511(a)(5) and (8), and, in particular, the second requirement thereto, **the conditions which led to the removal and placement of the child** continued to exist. ***See id.*** at 351. Here, we are analyzing subsection (a)(2), which does not involve consideration of whether **the conditions which led to the removal and placement of the child** continued to exist. Thus, we find ***C.B.*** inapplicable.

need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Having found sufficient grounds for termination pursuant to Section 2511(a)(2), we now turn to Father's third listed issue, which challenges the orphans' court's finding that termination was proper under Section 2511(b). Specifically, Section 2511(b) affords "primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Our Supreme Court has generally outlined this inquiry, as follows:

> [C]ourts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent.
>
> Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.
>
> Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The courts must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*K.T.*, 296 A.3d at 1105-06 (cleaned up).

- 17 -

Specifically, the child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *Id.* at 1109. While our Supreme Court has directed that a Section 2511(b) inquiry must include consideration for the bond between the parent and the child, the Court has explained that "[i]t is only a necessary and beneficial bond, after all, that should be maintained." *Id.* "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citing *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa. Super. 2008)).

Thus, the extent of the "bond-effect analysis necessarily depends on the circumstances of the particular case." *J.M.*, 991 A.2d at 324 (cleaned up). Rather, it is within the province of the orphans' court to "consider the totality of the circumstances when performing a needs and welfare analysis." *M.E.*, 283 A.3d at 839 (cleaned up). This Court has clarified that it is "within the discretion of the orphans' court to prioritize the safety and security" of children "over their bonds with their parents. *Id.* We will not disturb such an assessment if the orphans' court's factual findings are supported by the record. *Id.*

In concluding that the Children's developmental, physical and emotional needs and welfare supported termination of Father's parental rights, the

orphans' court reasoned that Father failed to "follow[] through and compl[y] with the [A]gency to take any meaningful steps towards reunification," even during the period where he was not incarcerated. Orphans' Court Opinion, 12/13/23, at 14 (unpaginated) (cleaned up). Moreover, given Father's reincarceration, he was "not an option for the [Children] at this time even if Father had complied with the recommendations of the court and the agency." *Id.* The court further stated:

> The [Children]'s needs are being addressed and the [Children are] reported to be making progress in areas where there was struggle at the time of removal. The court does not base its decision upon the environmental factors that are outside [parental] control but rather bases its decision on whether or not termination of parental rights … will best serve the developmental, physical, and emotional needs and welfare of the [Children].

*Id.*

Father, however, argues that, as Children's issues persist in the absence of visitation with Father, visitation with him should at least be attempted. He concedes that this should commence in the context of a therapeutic setting. Father states:

> Given the fact that the Children continue to have serious and often severe behaviors despite being deprived of visits with their Father and despite all the therapy that they have had, it would certainly appear that it would be in the best interests of the Children to at least try to have visits with their Father, in a therapeutic setting initially. The Children are struggling greatly anyway, and if there are dangers presented in the meetings with Father, then the meetings could be stopped. Father understands that we are at the termination step of these proceedings at the present time and not at ongoing visitation. However, this [c]ourt still must make a best interest determination.

Father's Brief at 32-33.

Upon review, the orphans' court's findings pursuant to Section 2511(b) are supported by the certified record, and free from legal error. As we discern no abuse of discretion, we will not disturb them. Father and the Children do not share a necessary and beneficial relationship pursuant to Section 2511(b). Indeed, the Children share a bond and beneficial relationship with their Maternal Aunt, with whom they desire to remain. *See K.T.*, 296 A.3d at 1113.

Specifically, the Children had no contact with Father for approximately a year and half prior to their adjudication. *See* Agency Exhibit 12; *see also* N.T., 6/29/23, at 82-83. While there was subsequent contact via telephone, as well as cards, this produced a negative response from the Children. *See* N.T., 11/16/23, at 19-20, 58-62, 88-89. In reaction to a telephone call, Ms. Wannamaker described, "It actually caused [M.D.S.] and [M.J.-M.S.] to defecate in their pants." N.T., 11/16/23, at 19. The court then ultimately suspended all contact in May 2022. *See* Agency Exhibit 12; *see also* N.T., 11/16/23, at 12, 18-19, 45, 51, 61, 74. This "no contact" order remained in place at the time of the subject proceedings. *See* Agency Exhibit 12.

Notwithstanding, Ms. Wannamaker testified to no negative impact to the Children as a result of the lack of contact with Father. *See* N.T., 11/16/23, at 76-77. Ms. Lavalle stated that the Children do not talk about Father. *See* N.T., 11/2/23, at 13, 18, 23, 28. This was confirmed by Dr. Mahady. *See id.* at 65. Further, Ms. Wannamaker noted that the Children do not want to live with

Father and T.D.S. and M.J.-M.-S. do not even want any contact with Father.[14]
*See* 11/16/23, at 31, 37, 39, 66; *see also* N.T., 11/2/23, at 54, 74, 144. As
such, in particular to T.D.S., Dr. Mahady expressed that it would not be
harmful and would in fact be irrelevant if he did not see Father. *See* N.T.,
11/2/23, at 78.

Moreover, Ms. Wannamaker opined that Father would not be capable of
meeting the Children's special needs. *See id.* at 42-43, 83. She testified:

Q. Do you believe the parents are capable of meeting the
[C]hildren's needs at this time?

A. No.

Q. Why not?

A. [The Children] all have mental health diagnoses of PTSD, and
then [T.D.S.] has an autism diagnosis.

They have extensive trauma and emotional and behavior
problems due to what they experienced in their parents' care.

I believe if [the C]hildren went back with their parents, we would
see them get a lot worse as they continue to voice, they do not
want to be with either parent.

*Id.* at 42.

In contrast, Ms. Wannamaker indicated that the Children are in a pre-
adoptive foster home with Maternal Aunt where they are doing well with all of

---

[14] Ms. Wannamaker recounted that, although M.D.S. indicated he "wouldn't
mind contact with [F]ather," this was connected to his desire to again receive
gifts from Father. N.T., 11/16/23, at 66; *see also* N.T., 11/2/23, at 127-28.

their needs being met. *See id.* at 38-41. She observed that the Children "are so attached and bonded to their foster home[]." *Id.* at 38. Ms. Wannamaker stated, "The[ C]hildren are in [a] very loving and appropriate foster home[]. The[y] consistently voice to me that they never want to leave [the] home, and they do not want to live with either parent. … I believe taking [the C]hildren out of that home would cause more harm than good." *Id.* at 37; *see id.* at 38-39. She continued,

> The boys overall are doing well in their foster home. They also have severe mental health and trauma that they are—they continue to work through, and that is extensive, so we can't say how long it will take for that, but they do well. They work well with the providers.
>
> They all report to be safe and that they have their needs met. The [C]hildren, again, do have mental health diagnoses and work with the contracted providers, and [Maternal Aunt] ensures all their needs are being met.

*Id.* at 41. Despite acknowledging ongoing behavioral issues as a result of the trauma they experienced, Ms. Wannamaker observed that "[Maternal Aunt] is that safe space and safe person" for the Children. *Id.* at 41-42.

As to the Children's overall progress, Ms. Wannamaker further testified:

> [The C]hildren . . . have much better grades, school staff, teachers, principals have reached out to us stating specifically [Maternal Aunt], what a wonderful job she does, all the effort she puts into these children.
>
> . . .
>
> When [the C]hildren came to [Maternal Aunt], they all did have some delays of some sort. They were not attending school in [M]other['s] and [F]ather's care.

> And since then, they just have made a ton of developmental and emotional improvements, being able to voice their needs, being able to begin to talk about their trauma and the fear and the things that these children have been put through and experienced with their parents.

*Id.* at 76-77. As a result, Ms. Wannamaker opined that termination of Father's parental rights would best serve the Children's needs and welfare and would not result in harm. *See* N.T., 11/16/23, at 37-39, 46.

Here, the Children lived in the same pre-adoptive placement for over two years at the conclusion of the subject proceedings and have formed a loving, safe, stable, and supportive bond with Maternal Aunt. The Agency caseworker testified that the Maternal Aunt provides for all of the Children's needs, including their special needs. Comparatively, Father is unable to meet Children's special needs and severing his parental rights would not cause the Children irreparable harm. As such, the record supports the termination of Father's parental rights pursuant to Section 2511(b).

Finally, we will briefly address Father's fourth and fifth issues, which we address together. Specifically, Father asserts that the orphans' court erred in involuntarily terminating his parental rights as the Agency failed to provide him visitation and as the Agency's expert testified that such visitation could be a therapeutic breakthrough for the Children, respectively. *See* Father's Brief at 40-42. We conclude that Father failed to preserve and waived these issues as he failed to provide a meaningful discussion citing to relevant law in his brief. *See In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017)

(explaining this Court will not review an appellant's claim unless it is included in both the concise statement and statement of questions involved, developed in his or her argument, and supported by citation to relevant legal authority). Regardless of our finding of waiver, we observe that Ms. Wannamaker, while acknowledging the possibility of a therapeutic breakthrough due to contact or visitation with Father, confirmed that this was speculative. *See* N.T., 11/16/23, at 64, 73.

Based on the foregoing, we affirm the orders involuntarily terminating Father's parental rights.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE:  9/27/2024